### DOMSCHKE v. DOMSCHKE.

(Supreme Court, Appellate Division, Second Department. May 6, 1910.)

MARRIAGE (§ 58*)—GROUNDS FOR ANNULMENT—FRAUD.

The false representation of defendant to plaintiff prior to their marriage that she had been the wife of another, who was the father of her child, when she had been his mistress, being one that can be material to the extent that but for it plaintiff would not have consented to marry her, will sustain an action to annul the marriage on the ground of fraud.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 122; Dec. Dig. § 58.*]

Carr and Burr, JJ., dissenting.

Appeal from Special Term, Kings County.

Action by Rudolph P. Domschke against Annie Domschke. From a judgment dismissing the complaint, plaintiff appeals. Reversed, and new trial granted.

Argued before JENKS, BURR, THOMAS, RICH, and CARR, JJ.

George C. Basch, for appellant.
Isidore Witkind, for respondent.

JENKS, J. This is an action by a husband to annul his marriage for fraud, in that prior to the marriage his wife represented to him that she had been the wife of a man then deceased, to whom her child

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

was born, when in truth she had been that man's mistress and the child was his bastard. The plaintiff pleaded that since the discovery of the fraud he had not cohabited with the defendant. It was conceded on the record that the parties had cohabited together for six years subsequent to their marriage, and that there was no issue, whereupon the Special Term dismissed the plaintiff because he had not pleaded facts sufficient to constitute a cause of action, and he appeals. I think that the Special Term erred.

In Reynolds v. Reynolds, 3 Allen (Mass.) 605, Bigelow, C. J., says that it has been contended by some writers, especially the commentators on the civil law, that chastity is a quality that lies at the foundation of the contract of marriage and constitutes one of its essential elements, citing Vœt, 24, 2, 15, which see, and 1 Fraser's Dom. Rel. 231. Montesquieu in his Spirit of the Laws, 23, 21, writes that since the time of Ulpian a freeman was forbidden to marry a woman who had led a disorderly life. See, too, Bishop on Marriage, Divorce and Separation (volume 1, 479 et seq.). But many decisions and many text-writers have pronounced against annulment of marriage subsequent to consummation on the ground of the false representation of the wife previous to her marriage that she was chaste. For examples, see Reynolds v. Reynolds, supra; Carris v. Carris, 24 N. J. Eq. 524; Allen's Appeal, 99 Pa. 196, 44 Am. Rep. 101; Smith v. Smith, 8 Or. 100; Wier v. Still, 31 Iowa, 107; Leavitt v. Leavitt, 13 Mich. 452; Shrady v. Logan, 17 Misc. Rep. 330, 40 N. Y. Supp. 1010; Schouler on Husband and Wife, § 27; Bishop on Marriage, Separation and Divorce, supra.

The proposition of the Special Term must be that a false representation of such fact cannot sustain an action brought after the marriage and its consummation for an annulment on the ground of fraud.

Gray, J., writing for a unanimous court in Di Lorenzo v. Di Lorenzo, 174 N. Y. 472, 67 N. E. 64, 63 L. R. A. 92, 95 Am. St. Rep. 609, says:

"While, then, it is true that marriage contracts are based upon considerations peculiar to themselves, and that public policy is concerned with the regulation of the family relation, nevertheless our law considers marriage in no other light than as a civil contract. Kujek v. Goldman, 150 N. Y. 176 [44 N. E. 773, 34 L. R. A. 156, 55 Am. St. Rep. 670]. The free and full consent which is of the essence of all ordinary contracts is expressly made by the statute necessary to the validity of the marriage contract. The minds of the parties must meet in one intention. It is a general rule that every misrepresentation of a material fact made with the intention to induce another to enter into an agreement and without which he would not have done so justifies the court in vacating the agreement. It is obvious that no one would obligate himself by a contract if he knew that a material representation, entering into the reason for his consent, was untrue. There is no valid reason for excepting the marriage contract from the general rule."

And also declares, after quoting from and citing Code Civ. Proc. § 1743, subd. 4, and section 1750:

"This language is broad, and warrants but the one reasonable construction, that the fraud must be material, to that degree that, had it not been practiced, the party deceived would not have consented to the marriage."

I think, then, that under the authority of Di Lorenzo's Case, supra, the soundness of the proposition of the Special Term must be determined by answering the question whether as matter of law such a false representation can be material to that degree that, had it not been practiced, the party deceived would not have consented to the marriage. It can be said that in our civilization a man assumes that his proposed wife is chaste, and that without reason he would not pay her the insult of query as to her virtue. But I can conceive of a case where a man before consenting to a contract of marriage might ask such a question of the woman outright, and rely upon her answer. Or the case at bar is an instance where the circumstances might compel some representation in explanation of them. It is quite true that such a representation is not as to the essentialia of the marriage contract, for previous chastity is not a necessary qualification for cohabitation or for the full discharge of the duties of consortium. But it seems to me that the question is whether such representation may not be as to a fact material to the consent of the other party to make the contract. Cannot a man regard chastity as an essential qualification of the woman he proposes to marry, and be unwilling to take even an Aspasia to his bed and board? In Di Lorenzo's Case the misrepresentation was that a child was the issue of the illicit relations of the parties. That representation could not strike at the essentialia of marriage, and yet the court pronounced it material, saying:

"In this case the representation of the defendant was as to a fact, except for the truth of which the necessary consent of the plaintiff would not have been obtained to the marriage. It was designed to create a state of mind in the plaintiff, the operation of which would be to yield a consent to marry the defendant, in the belief that he was rectifying a great wrong. The minds of the parties did not meet upon a common basis of operation. The artifice was such as to deceive a reasonably prudent person, and to appeal to his sense of honor and of duty. The plaintiff had a right to rely upon the defendant's statement of a fact, the truth of which was known to her and unknown to him, and he was under no obligation to verify a statement, to the truth of which she had pledged herself. It was a gross fraud, and, upon reason, as upon authority, I think it afforded a sufficient ground for a decree annulling the marriage contract."

Thus we have the principle enunciated that the materiality goes to the consent to the contract, and need not strike at the capacity to make the contract and to perform it. A man is not presumed to contract for marriage simply upon the basis of physical ability of the woman for cohabitation; for consortium implies much more. And if a man consent to contract to marry a woman who falsely represents herself as chaste, and yet marries her who has been unchaste, he may thereby be induced to agree to a contract which necessarily requires personal performance by one who is of a different status than he was led to believe. The bad character of the plaintiff or his or her lascivious conduct is a defense to a breach of promise action. Palmer v. Andrews, 7 Wend. 142; 2 Parsons on Contracts (8th Ed.) bottom paging 69, citing authorities. That author also says:

"It has been said, also, that if a widow conceals her previous marriage, and betroths herself as a virgin, this would be a fraud, and would avoid the contract. It is going quite far to consider this fact alone as constituting a fraud, but it could seldom occur but under circumstances which would probably de-

termine the character of the concealment; and, if this were fraudulent, it must, of course, have the usual effect of fraud upon the contract, for if obtained by fraud, whatever that fraud may be, the contract is void."

I cite this principle as bearing on the question of materiality. Bigelow on Fraud (volume 1, p. 497) says:

"In the next place the representation must have been material; that is, it must not only have induced the action taken, it must have been adequate to induce it by offering a motive sufficient to influence the conduct of a man of average intelligence and prudence. Still a party who has effected his purpose through a misrepresentation cannot deny its materiality [citing cases]."

2 Parsons on Contracts (8th Ed.) p. 895, writes:

"But, as before, we must say that there is no positive standard by which to. determine whether the fraud be thus material or not. Nor can we give a better rule for deciding the question than this: If the fraud be such that, had it not been practiced, the contract would not have been made, or the transaction completed, then it is material to it; but, if it be shown or made probable that the same thing would have been done by the parties, in the same way, if the fraud had not been practiced, it cannot be deemed material."

See, too, Valton v. National Fund Life Assurance Co., 20 N. Y. 32–37; Canham v. Barry, 15 C. B. 597. If one would go so far as to say that a man would or would not be led· to give or withhold consent to the contract of marriage upon the single consideration whether the woman was chaste or unchaste, the answer is that it is not necessary that the false representation should be the sole inducement. Pomeroy's Equitable Remedies, § 890; Kerr. on Fraud and Mistake, p. 74.

I think, then, that such a misrepresentation can afford ground for the annulment of a marriage for fraud because as matter of law it can be material upon the question of consent, which is essential to the contract of marriage. To reach any other conclusion is to say in effect that the fact that the woman otherwise acceptable is unchaste cannot be sufficient motive for a man of average intelligence and prudence to refuse consent to marriage. This doctrine would put a Cyprian on the marriage plane of a virgin, and makes no distinction in respect to virtue as between a woman who had been a mistress and one who had been a wife.

I cannot perceive that the question is affected by the circumstance that the marriage was consummated, for the sole relation of the false representation, as viewed by the law, is to the consent to contract of marriage, and the sole limitation to the action, as pointed out in Di Lorenzo's Case, supra, is voluntary cohabitation subsequent to the full knowledge of the facts. This court must decide this question upon the law as declared by our statute and as expounded by our highest court. That court has well said in Kujek v. Goldman, 150 N. Y., at page 182, 44 N. E. 775, 34 L. R. A. 156, 55 Am. St. Rep. 670:

"While it is not agreeable to treat a subject of sacred importance upon this narrow basis, it is necessary to do so, for our law considers marriage in no other light than as a civil contract."

My conclusion is that the alleged false misrepresentation can be material in such an action, and therefore may be material in this action. There is nothing more to decide upon the record of this appeal.

I advise that the judgment be reversed and that a new trial be granted.

RICH, J., concurs.

THOMAS, J. The defendant, it must be assumed, represented that she in the purity of wedlock had given birth to her child, and thereby induced the plaintiff to enter into the contract of marriage. In fact, for eight years she had been the mistress of another, and in such offensive state became the mother of an illegitimate child. Hence the plaintiff became the husband of an unchaste woman, and the stepfather of a bastard, whereby his family life was tainted in its most intimate relations. Presumptively a man would abhor such a marriage, not only on account of the personal society into which it would bring him and his offspring, if such there should be, with the accompanying impairment or destruction of the sacred love and respect that justify marriage, but also on account of the obloquy and social ostracism that the connection upon exposure might entail. I can conceive of no more distressing affront to the sensibilities nor 'more profound injury to the sanctity of the marriage relation; and, where it is effected by actual fraudulent representation that the woman is pure and the child legitimate, the court should not hesitate to relieve the person who has been led into the most inviolable of all personal contracts.

CARR, J. (dissenting). The plaintiff, after living with the defendant as his wife for six years, now asks that the marriage be annulled on the ground that she procured his consent thereto by false and fraudulent representations that she was at that time the widow of one Manson, and that her child, then about six years old, was the offspring of her marriage with Manson, when, in fact, Manson and she, though living together, had never been married, and the child was born out of lawful wedlock. His complaint was dismissed on the opening of the trial on the ground that it did not set forth facts sufficient to constitute a cause of action. This was the same thing as if the defendant had demurred to the complaint on that ground. The trial court granted the motion, which was nothing more than a mere nonsuit. Yet the decision filed by the court, and the judgment entered thereon, purported to dismiss the complaint "upon the merits." On this appeal we may amend the judgment by striking out the words "upon the merits." As to the sufficiency of the complaint, the question is at once novel, so far as our decided cases go, and in the highest degree important, so far as the common life of our people is concerned. After some study, I feel justified in saying that I know of no well-considered case in this state or in England, or in fact in any part of this country, which has held that a marriage will be annulled on the claim of one of the parties that the other had made false representations as to his or her previous chastity, which induced the complaining party to enter into the status. There are many well-considered authorities to the contrary, of which Mr. Justice JENKS cites several. Were it not for the opinion of the Court of Appeals in Di Lorenzo v. Di Lorenzo, 174 N. Y. 467, 67 N. E. 63, 63 L.

R. A. 92, 95 Am. St. Rep. 609, there would be little room even for debate on this question. Yet, as I see that opinion, it does not affect this precise question at all. Certainly there was nothing decided in that case which necessarily controls the case now here. That court has told us frequently enough, what all of us well know, though at times it be forgotten, that the general expressions in its opinions must be measured by the precise facts before it. In that case there had been a trial of the issues, and the jury found the following facts: The plaintiff had been induced to marry the defendant on false representations made by her that she had given birth to a child of which the plaintiff was the father. She exhibited the child to him, which was said to have been born during his absence from the state. Believing her statements, and solely for the purpose of legitimatizing his supposed offspring, he entered upon a ceremonial marriage. He discovered thereafter that the child in question was not only not his child, but not even his wife's child, but was in fact a spurious child, fraudulently palmed off upon him by the woman, who had never given birth to any child. The Court of Appeals held that these facts constituted a gross fraud upon the plaintiff which reached to and destroyed the very essence of his consent to the marriage, and that he was entitled to an annulment of the marriage. Our statute (Domestic Relations Law [Consol. Laws, c. 14] § 10) declares the rule as follows:

"Marriage, so far as its validity in law is concerned, continues to be a civil contract, to which the consent of parties capable in law of making a contract is essential."

It will be noted that there is no attempt to define marriage as a civil contract except for the one specified purpose, and there is no warrant for any larger statement. The same statute classifies marriages as void and voidable. While free consent is deemed essential to the inception of the relation of man and wife, the statute itself recognizes and declares the existence of certain impediments in the way of a legal marriage which not even the free consent of the parties can overcome, and declares marriages, contracted in face of these impediments, void from the beginning. Such, for instance, are the impediments of consanguinity set forth in section 5 thereof. These absolute impediments are but few compared to the number which were enforced in the ecclesiastical courts in England, and which, to a greater or less degree, came from the provisions of the early canon law of the church. As to the marriages classified as voidable (section 7), the impediments specified are to a large extent the same as those recognized in the canon law, and which, in fact, have been recognized in every civilized system of law relating to marriage since early Roman history. Among the impediments so declared as to "voidable marriages" is one where either party "consents to such marriage by reason of force, duress, or fraud." Domestic Relations Law, § 7. These present statutory declarations are but re-enactments of the provisions on this subject found in the first revision of our statutes. The purpose of these enactments is quite clear. Though we took over our common-law and equity jurisprudence from England, we did not take over the system of ecclesiastical courts, as we had no state church. In our changed system we distributed among our civil

courts the various subject-matters which fell formerly within the exclusive jurisdiction of the ecclesiastical courts, as for instance marriages, wills, etc. The statute as to marriages declared no radically new rule. It merely declared what was to be adopted and preserved from the old rules.

It is quite true that the Court of Appeals placed its decision in the Di Lorenzo Case upon the ground that under our statutes marriage is a civil contract, and must be annulled on the complaint of the injured party, if it be entered into through fraud as to a material element of the consent. This rule, however, as before indicated, is not different to that which applied in the ecclesiastical courts, where marriage was deemed sacramental when entered into by baptized persons. The beginning of the relation, even there, was contractual, and implied free consent for its inception. If this consent was procured by a material fraud, it was always held that the marriage could be annulled on proper proof. What we call "fraud," they called "error," in regard to matrimonial causes. We divide fraud into "material" and "immaterial." We consider as "material" that which reaches the essence of the consent of the parties. The canonists divided "error" into "error substantialis" and "error accidentalis." "Error substantialis" was one that reached the essence of the consent, and was material to it, while "error accidentalis" arose where the fraud or mistake was incidental rather than material. On the question of the necessity and freedom of consent, both our own law, as supplied in the Di Lorenzo Case, and the canon law, are in full harmony. At the same time, neither at canon law nor heretofore in equity has a mere representation as to previous chastity been considered as "material," or as producing "error substantialis" in the giving of the required consent for a valid marriage. Nor do I think we should be justified in inferring from the decision of the Court of Appeals in the Di Lorenzo Case that it intended to declare any new rule on this question. Nor should we be swayed too much by the supposed logical deductions from the rule there declared. Law and logic should work together, but we know very well that they do not always keep equal step. Logic exists independently of human habit or mode of thought, while law is but the reflection of human life and custom. Logic does not know expediency, while law seldom escapes it, for life is largely regulated by it. The rule so frequently applied in the past, that courts will not look behind the marriage on the question of previous chastity, rests largely upon human expediency. There is a wisdom of life as well as a logic of law, and a working system of law must embrace both elements. The question is a delicate one, but, at the same time, a most practical one, which the world has been solving in its own way for many centuries.

It should not be supposed that there is any analogy between the question here considered and the one time rule in Roman law quoted by Mr. Justice JENKS from Montesquieu, that an impediment to legal marriage existed as to a woman who had led "a disorderly life." The rule is found in the "Fragments of Ulpian," and is taken from the "Lex Julia," which was an edict of Augustus, aimed at a condition of society then existing. It forbade Senators, and later, freemen, from marrying

common prostitutes. It was directed, not against a woman who had simply been unchaste, and in that sense "disorderly," but against those who marketed their bodies. Even this legal impediment was not continued by Justinian in the Institutes, or Pandects, and is not to be found in any system of jurisprudence since existing. If the rule contended for so forcibly and so elegantly by my Brother JENKS is to find its way into our system of jurisprudence, I presume it will be necessarily of equal application, regardless of sex. If so, we may well recall the opening of Pandora's box.

For the reasons above given, I vote to modify the judgment by striking therefrom the words "upon the merits," and to affirm the judgment as so modified.

BURR, J. I concur with Mr. Justice CARR. The vital question in this case is whether previous chastity is a material fact, misrepresentation as to which will justify the annulment of a consummated marriage on the ground of fraud. While it may be unfortunate that a man or a woman finds, after the contract of marriage has been consummated, that the other party to the relation has at some time previously been guilty of a lapse from virtue, that fact alone would not justify disturbing the status which then exists in which the public as well as the parties are entitled to consideration. See Svenson v. Svenson, 178 N. Y. 54, 70 N. E. 120. The consequences of the doctrine suggested by Mr. Justice JENKS are far reaching. The relations between parties to a marriage contract antecedent to the contract itself are certainly relations of trust and confidence. Page v. Horne, 11 Beavan, 227; Cobbett v. Brock, 20 Beavan, 524. When such relations exist, it is not enough to keep silence with regard to facts material to the contract about to be made, or to make no false statements respecting the same. The affirmative duty exists of making a full and complete disclosure if the contract is to be sustained. If previous chastity is a fact material to the marriage contract, then it is not enough that the party about to enter into that contract should refrain from making any false affirmation with regard to it. The duty would devolve upon such person to make a full and free disclosure with regard to previous habit of life. So far as the law regards chastity, it makes no distinction between the sexes. In the forum of good morals the law of personal purity is the same for the man and the woman. Unfortunately it is the common impression that man is the more frequent transgressor. If I am right in my premises, may it not be that in many instances, when the parties have wearied of the marriage bonds, although the contract has been consummated and for many years and during its entire continuance no false step has been taken, actions to annul such marriages may be successfully maintained, notwithstanding no active deception has been practiced, solely because some youthful transgression was not disclosed?

I think that the judgment should be affirmed.